UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

STEVEN MEDINA, an infant by          :     HONORABLE JOSEPH E. IRENAS
his mother DIANA ALOMAR,             :
                                     :     Civil Action No. 05-4526 (JEI)
        Plaintiff,                   :
                                     :
        v.                           :          **OPINION**
                                     :
JO ANNE B. BARNHART,                 :
Commissioner of Social               :
Security,                            :
                                     :
        Defendant.                   :


**APPEARANCES:**

COMMUNITY HEALTH LAW PROJECT, Inc.
By: Brian G. Smith, Esq.
900 Haddon Ave., Suite 400
Collingswood, NJ 08108
        Counsel for Plaintiff.

CHRISTOPHER CHRISTIE, UNITED STATES ATTORNEY
BY: Marla Piazza Siegel, Esq.
Special Assistant U.S. Attorney
Social Security Administration
Office of the General Counsel
26 Federal Plaza, Room 3904
New York, NY 10278-0004
        Counsel for Defendant.


**Irenas**, Senior District Judge:

        Steven Medina, an infant, brings this action by and through

his mother Diana Alomar pursuant to Section 205(g) of the Social

Security Act ("Act"), 42 U.S.C. § 405(g) and Section 1634(c)(3)

of the Act, 42 U.S.C. § 1383(c)(3), for review of the final

determination of the Commissioner of Social Security

("Commissioner") denying Medina's application for Social Security Disability Insurance Benefits.  For the following reasons, this Court Remands the Commissioner's decision for further proceedings.

## I.

On April 11, 2002, Steven Medina, by and through his mother Diana Alomar filed an application with the Social Security Administration (the "SSA") for a period of disability benefits. (R. at 44.)  Medina is an infant, age 5, who was born approximately five weeks premature, and suffers various mental and physical impediments as a result.  (R. at 16.)  The SSA denied Medina's application on November 8, 2001, and subsequently denied a request for reconsideration on January 18, 2002. (R. at 52.)

Medina appealed the denial of his claim and requested a hearing. (R. at 56.)  The hearing was held before an Administrative Law Judge ("ALJ") on June 3, 2004, in Voorhees, New Jersey. (R. at 30.)  ALJ Christopher K. Bullard issued a decision on July 23, 2004, holding that Medina "is not disabled within the meaning of the Social Security Act" and was not "under a 'disability,' as defined in the Social Security Act, at any time through the date of this decision." (R. at 15, 26.)

On October 22, 2004, Medina requested review of the ALJ's decision by the Appeals Council of the SSA, which denied her

request for review on July 15, 2005.  (R. at 5.)   ALJ Bullard's decision thus stands as the final decision of the Commissioner. Medina filed her appeal with this Court on September 16, 2005.


**II.**

Steven Medina is a five-year old child residing with his mother, Diana Alomar in Camden, New Jersey.  (R. at 108.)  Until his third birthday, Steven was enrolled in an "early intervention program," in which he received daycare services five days a week and occupational and physical therapy services one day a week. (R. at 37.)   Following his third birthday, he was enrolled in a special education preschool for children with disabilities. (*Id.*)  Steven is to continue receiving occupational and physical therapy services, which are to be provided by the board of education.  (*Id.*)

It is undisputed that Steven suffers from various developmental and cognitive delays, impairments of his motor skills, hearing loss, and gastroesophageal reflux disease. (R. at 16.)  The record before the Court contains numerous medical reports from examinations by hospitals and physicians, as well as several progress reports from Steven's educators and therapists.

Among the medical reports included in the record are the examinations of Dr. Bruce M. Schnall, Dr. M. Fernandez, Dr. Howard Zeidman, Dr. Mark Mintz, Dr. Maria Mascarenhas, and the

3

SSI eligibility evaluation of Social Security Administration medical consultant Dr. M. Wu.

Dr. Mark Mintz examined Steven on December 24, 2001, and again on January 9, 2002, for possible seizure activity. (R. at 188, 202.) Following his examinations, Dr. Mintz concluded that Steven's symptoms had resolved themselves without intervention, and that Steven's neurological health was within normal parameters and could be followed "clinically." (R. at 202.)

Dr. Bruce M. Schnall examined Steven on July 12, 2001, August 31, 2001, and January 16, 2002, to screen him for Retinopathy of Prematurity ("R.O.P.").  (R. at 178, 203.) Steven's initial examination indicated that he had an immature retina.  However, both subsequent examinations yielded no evidence of R.O.P.  During Steven's 2002 examination, Dr. Schnall indicated that "Steven appears to be escaping the ocular complications of prematurity." (*Id.*)

Dr. M. Fernandez performed a Medical Examination on Steven for the State of New Jersey Division of Family Development on November 13, 2001, and diagnosed Steven as having acid reflux. (R. at 191.)

Dr. Howard Zeidman examined Steven on numerous occasions for treatment of his mobility impediments and frequent falls. (R. at 395-403.) Dr. Zeidman prescribed Steven orthopaedic shoes to aid in his walking and to correct "in-turning" of Steven's feet.

4

(*Id.*) Dr. Zeidman reported that Steven showed steady improvement with the shoes, and that "conservative management" of his condition would be sufficient.  (R. at 396.)  Steven continued to wear his corrective shoes, as he "walks better with them than without them." (R. at 395.)

On March 17, 2003, Steven was examined by Dr. Mascarehas for his gastroesophogeal reflux symptoms.  (R. at 404-405.)  Dr. Mascarehas diagnosed Steven as having Gastroesophogeal Reflux Disease ("GERD").  (R. at 405.)  Dr. Mascarehas ordered that Steven be placed on a high calorie diet in addition to the medications that he was already taking for his gastroesophogeal symptoms.  Dr. Mascarehas observed that Steven's weight was in the 5th-10th percentile for his age and noticed that Steven's height was in the 10th percentile for his age. (*Id.*)

On July 23, 2002, a Social Security Administration Childhood Disability Evaluation was performed on Steven by Dr. M. Wu. (R. at 206-213.)  Dr. Wu found that although Steven suffered from apnea of prematurity and gastroesophogeal reflux disease, that these impairments were not severe under the Social Security Administration's criteria, and constituted a "less than marked" limitation of Steven's health.  (*Id.*)

In addition to the medical examinations, Steven's cognitive and developmental progress was monitored and evaluated by several educators and educational therapist who had contact with Steven

during his enrollment with the Camden Board of Education Individualized Education Program ("IEP")(R. at 126-171,) the New Jersey Early Intervention System (R. at 246,) and the Southern New Jersey Regional Early Intervention Collaboration (R. at 455.) Steven received IEP evaluations for the 2003-2004 school year (R. at 126,) and for the 2004-2005 school year (R. at 154). Steven received progress reports from the New Jersey Early Intervention System from the periods of March, 2002 to January, 2004. (R. at 246.) Steven received an assessment from the Southern New Jersey Regional Early Intervention Collaboration covering the period between March 2003 and March 2004. (R. at 455.)

In his 2003-2004 IEP report, Steven was described as having a panoply of physical and cognitive developmental problems, including difficulties with feeding as a result of his esophageal reflux condition, and inner ear infections requiring myringotomy tubes on several occasions. (R. at 146.) Steven was also described as having frequent sinus congestion, despite having had his adenoids removed. (*Id.*) Steven's gross motor functioning was characterized as being impaired due to inward rotation of each foot, particularly his right foot, and he was said to suffer from frequent falls. (*Id.*) Steven's 2003-2004 IEP report stated that Steven's language skills are considered "slightly delayed," but that Steven's speech articulation is considered to be "nearly age appropriately developed." (*Id.*) The same IEP report also

6

says, however, that "[Steven's] speech is barely understandable,"
that "weakness is noted in his socialization skills as he is
inclined to react physically when offended," and "some weaknesses
are suggested in his gross motor functioning as Steven tends to
fall down regularly." (*Id.*)  A section of the 2003-2004 IEP
report labeled "Present Levels of Educational Performance,"
additionally read:

> The therapist's observations revealed that Steven is
> delayed in both receptive and expressive language
> skills. His skills are Judged to be on approximately
> a 24-30 month level. Steven is able to answer
> questions verbally and usually uses one to two word
> utterances, although some three and four word
> utterances were noted. Steven was able to follow
> one, and some two-step directions, but lost focus
> during the activity and was not able to be
> redirected. Articulatory precision, attending to
> tasks, and vocabulary skills are Steven's areas of
> weakness and should be directly addressed during
> speech therapy.

(R. at 152.) Both Steven's 2002-2003 and 2004-2005 IEP
reports discuss multiple health, educational, and social
problems, including difficulties with feeding, esophageal reflux
condition, chronic inner ear infections, frequent and sinus
congestion, lactose intolerance, and an inward rotation of his
foot, causing Steven to fall down frequently.  (R. at 128, 155.)
Both of Steven's IEP reports additionally state: "Steven's
disability inhibits his ability to make satisfactory academic
progress in a manner commensurate with his overall global
intellectual potential." (*Id.*)

The Southern New Jersey Regional Early Intervention Collaborative's initial evaluation of Steven, dated March 6, 2002, states that the child's cognitive, communications, and social emotional needs were within normal limits for his age. (R. at 407.)  However, Steven was found to have at least 25 percent delays in two or more developmental areas. (R. at 409.)

Steven's New Jersey Early Intervention System evaluation dated September 4, 2002 stated that Steven is making progress, but would benefit from continued early intervention to help him use both sides of his body and to address weight and feeding issues. (R. at 258, 261.)  His motor skills were described as greatly improved, however he was described as still shifting his weight inappropriately.  (R. at 260.)  Steven was described as having "significant feeding issues." (R. at 260.)

Steven's March 12, 2003 evaluation from the Southern New Jersey Regional Early Intervention Collaborative showed general improvement in most areas, however his age equivalency levels were not assessed.  (R. at 455.)  Steven was found to have continued need for physical therapy because of the abnormal rotation present in his lower extremities which caused him decreased balance and frequent falls.  (R. at 458.)

Steven's New Jersey Early Intervention Report dated March 10, 2004 stated that Steven was eligible for Early intervention services based upon a 25 percent delay in two or more

developmental areas. (R. at 266.)  His gross motor skills were described as still needing attention through physical therapy, as were his sensory abilities.  (R. at 265.)

### III.

The standard for judicial review of final determinations of the Commissioner is set forth in 42 U.S.C. § 405(g) and 42 U.S.C. § 1383(c)(3).  Findings of fact by the Commissioner that are supported by "substantial evidence" are conclusive.  42 U.S.C. § 405(g); 42 U.S.C. § 1383(c)(3). Substantial evidence has been defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S. Ct. 206, 83 L. Ed. 126 (1938)); *Lewis v. Califano*, 616 F.2d 73, 76 (3d Cir. 1980).  The administrative decision "should be accompanied by a clear and satisfactory explanation of the basis on which it rests." *Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981).

The decision should indicate not only the evidence that supports the ALJ's conclusion, but also any "significant probative evidence" that was rejected and the reasons for its rejection. *Id.* at 705.  The Third Circuit has elaborated further on the proper standard of review stating:

> [O]ur decisions make clear that determinations of the
> existence vel non of substantial evidence is not merely
> a quantitative exercise. A single piece of evidence
> will not satisfy the substantiality test if the
> Secretary ignores, or fails to resolve, a conflict
> created by countervailing evidence.

*Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983).

In reaching a conclusion, the ALJ must analyze and explain the weight he has given to all probative evidence. *Gober v. Matthews*, 574 F.2d 772, 776-77 (3d Cir. 1978). Although deference is given to administrative decisions, it is the duty of the reviewing court to scrutinize the entire record to determine whether the ALJ's findings are rational and supported by substantial evidence. *Id.* While it is true that the ALJ may weigh the credibility of the evidence, he must give some indication of the evidence which he rejects and his reason(s) for discounting such evidence. *Burnett v. Commissioner of SSA*, 220 F.3d 112, 121 (3d Cir. 2000). "In the absence of such an indication, the reviewing court cannot tell if significant probative evidence was not credited or simply ignored." *Id.* *See also Fargnoli v. Halter*, 247 F.3d 34, 42 (3d Cir. 2001). It is within this Court's discretion to affirm, modify, or reverse a Commissioner's final decision with or without remand. 42 U.S.C. § 405(g); *Podedworny v. Harris*, 745 F.2d 210, 221 (3d Cir. 1984).

**IV.**

An ALJ employs a three-step process when evaluating a child's claim of disability.  20 C.F.R. § 416.924.  In the first step, the ALJ must determine whether the claimant is currently engaged in "substantial gainful activity" as defined in 20 C.F.R. § 416.972.  § 416.924(b).  If the claimant is so engaged, his application will be denied.  § 416.924(b).

The ALJ next determines whether the claimant has "a medically determinable physical or mental impairment or combination of impairments that causes marked and severe functional limitations, and that can be expected to cause death or that has lasted or can be expected to last for a continuous period of not less than 12 months." § 416.906.  A claimant who does not have a "severe impairment" is not disabled. § 416.924(c).  Finally, in order to be considered disabled for the purposes of the Social Security Act, the claimant's impairment must meet, or be medically or functionally equal in severity to, an impairment listed in the Appendix. § 416.924(d). A claimant's impairment medically equals a listing when "the medical findings are at least equal in severity and duration of the listed findings." § 416.926(a).  An ALJ will compare medical evidence in the record to corresponding medical criteria shown for the listed impairment to make this determination.  § 416.926(a).

11

If a claimant's impairment does not meet, or medically equal, a listed impairment, the ALJ will next determine if the impairment is functionally equal to the listed impairments. § 416.926a(a).  To satisfy the "functionally equal" standard, a claimant must show that she suffers from an impairment of "listing-level" severity, meaning that the impairment "results in 'marked' limitations of two domains of functioning or 'extreme' limitation in one domain." § 416.926a(a).  A claimant's functional domains are evaluated within six categories: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for yourself; and (6) health and physical well-being. § 416.926a(b)(1)(i)-(vi).

A claimant demonstrates a "marked" limitation in a domain if his impairment seriously interferes with his ability to "independently initiate, sustain or complete activities." § 416.926a(e)(2)(I).  A "marked" limitation is one that is "more than moderate" but "less than extreme." *Id.*  An "extreme" limitation interferes very seriously with the claimant's ability to "independently initiate, sustain or complete activities." § 416.926a(e)(3)(I).  An extreme limitation is more than marked but does not mean a total lack or loss of ability to function. *Id.*

In this case, the first two steps of ALJ Bullard's

12

determination are uncontested.  First, Steven has never been
engaged in substantial gainful activity.  (R. at 17.)  Second,
ALJ Bullard concluded that Steven's developmental delays,
gastroesophageal reflux disease, and hearing loss constituted a
severe impairment because the disorders caused more than minimal
functional limitations and have lasted for more than twelve
months.  (*Id.*)  Medina contests the ALJ's determination at the
third stage of his disability determination, where the ALJ
determined that the evidence did not demonstrate an impairment,
or a combination of impairments, which meets or equals one in the
Listing of Impairments.  (R. at 25.)  Claimant also contests ALJ
Bullard's findings with regard to the credibility of Diana
Alomar's testimony.

### A.

The Third Circuit has held that unless the Commissioner has
analyzed all evidence and has sufficiently explained the weight
he has given to obviously probative exhibits, to say that his
decision is supported by substantial evidence "approaches an
abdication of the court's 'duty to scrutinize the record as a
whole to determine whether the conclusions reached are
rational.'" *Gober*, 574 F.2d at 776 (quoting *Arnold v. Secretary
of HEW*, 567 F.2d 258, 259 (4th Cir. 1977)).  "[A] reviewing court
may remand a case to the [Commissioner] for good cause, 'where

relevant, probative and available evidence was not explicitly weighed in arriving at a decision on the plaintiff's claim for disability benefits.'" *Dobrowolsky v. Califano*, 606 F.2d 403, 407 (3d Cir. 1979)(quoting *Saldana v. Weinberger*, 421 F. Supp. 1127, 1131 (E.D. Pa. 1976)).  While it is true that the ALJ may weigh the credibility of the evidence, he must give some indication of the evidence which he rejects and his reason(s) for discounting such evidence.  *Burnett v. Commissioner of SSA*, 220 F.3d 112, 121 (3d Cir. 2000).  "In the absence of such an indication, the reviewing court cannot tell if significant probative evidence was not credited or simply ignored."  *Id.  See also Fargnoli v. Halter*, 247 F.3d 34, 42 (3d Cir. 2001).

In this case, ALJ Bullard failed to explicitly weigh all the probative, relevant, and available evidence in reaching his conclusion.  Most notably, the ALJ failed to explicitly address all of the information contained in Steven's IEP reports from the Camden Board of Education. (R. at 126.)

In reaching his decision, ALJ Bullard relied heavily on certain statements in Steven's 2003-2004 IEP report.  In that IEP report, Steven's speech articulation was described by one of his teachers as being "nearly age appropriately developed." (R. at 146).  This statement was used in the ALJ's assessment of Steven's disability under the domains of "acquiring and using information," "attending and completing tasks," and "caring for

14

yourself." (R. at 21.)

While giving considerable weight to this statement, however, ALJ Bullard failed to discuss various other relevant language in Steven's IEP reports.  Foremost, the ALJ failed to address the section of Steven's 2003-2004 IEP labeled "Present Levels of Educational Performance,"  That section read:

> The therapist's observations revealed that Steven is delayed in both receptive and expressive language skills. His skills are Judged to be on approximately a 24-30 month level. Steven is able to answer questions verbally and usually uses one to two word utterances, although some three and four word utterances were noted. Steven was able to follow one, and some two-step directions, but lost focus during the activity and was not able to be redirected. Articulatory precision, attending to tasks, and vocabulary skills are Steven's areas of weakness and should be directly addressed during speech therapy.

(R. at 152.) At the time of the 2003-2004 IEP report Steven was 35½ months old.  The evaluation therefore assesses Steven's language skills as being delayed between 5½ and 11½ months. This is not an insignificant period of time for one so young. Such information regarding Steven's language development is potentially relevant as to at least three domains; "acquiring and using information," "attending and completing tasks," and "interacting and relating with others."  This information appears to contradict other parts of the IEP report relied upon by the ALJ, regarding Steven's speech articulation as being "nearly age appropriately developed."  It is also probative to the issue of Steven's developmental delays.

15

Additionally, the ALJ failed to address other evidence contained in Steven's IEP reports.  Page one of Steven's 2003-2004 IEP states that "[Steven's] speech is barely understandable," that "weakness is noted in his socialization skills as he is inclined to react physically when offended," and "some weaknesses are suggested in his gross motor functioning as Steven tends to fall down regularly." (R. at 146.)  Steven's IEP reports for both 2003-2004 and 2004-2005 discuss multiple health, educational, and social problems, including difficulties with feeding, esophageal reflux condition, inner ear infections, frequent sinus congestion, lactose intolerance, and an inward rotation of his foot, which caused him to fall down frequently. (R. at 128; 155.)  Both IEP reports also state: "Steven's disability inhibits his ability to make satisfactory academic progress in a manner commensurate with his overall global intellectual potential." (R. at 128; 155.)

While it is true that the ALJ addressed some of the above mentioned deficiencies, he failed to explicitly address the above cited evidence contained in the IEP reports which speaks to these conditions and the severity of Steven's limitations.  It is apparent that most, if not all, of the findings discussed in Steven's IEP reports might impact the determination of disability under one or more of the six domains of functional limitations.

Certainly, the ALJ is free to reject any evidence in the

record, provided he has a sound basis for doing so.  The record does in fact contain conflicting evidence which might suggest that Steven does not suffer "marked" or "extreme" limitations in any of the six domains.[1]  However, as the Court has already explained, although it is true that the ALJ may weigh the credibility of the evidence, he must give some indication of the evidence which he rejects and his reason(s) for discounting such evidence, because "in the absence of such an indication, the reviewing court cannot tell if significant probative evidence was not credited or simply ignored."  *Burnett,* 220 F.3d at 121 (3d Cir. 2000).  Here, it is uncertain from the ALJ's decision whether he discredited, or simply ignored, certain evidence contained in Steven's IEP reports.


**B.**

A claimant's subjective statements about pain or other symptoms, without more, cannot be the basis for a disability. *Jaramillo ex rel. Mesa v. Comm'r of Soc. Sec.*, 130 F.App'x 557, 561 (3d Cir. 2005); 42 U.S.C. § 1382c(a)(3)(A). Nevertheless, "[t]he mere lack of corroboration of testimony does not provide a basis to reject [a] claim." *Sincavage v. Barnhart*, 171 F.App'x 924, 927 (3d Cir. 2006); *see* Soc. Sec. Rul. 96-7p (1996)("An

---

[1] The Court observes that the results of many of the medical examinations contained in the record suggest continued improvement in Steven's various conditions.

17

individual's statements about the intensity and persistence of pain or other symptoms or about the effect the symptoms have on his or her ability to work may not be disregarded solely because they are not substantiated by objective medical evidence."); *see also* 20 C.F.R. § 402.35(b)(1) ("Social Security Rulings . . . are binding on all components of the Social Security Administration.").

In assessing Ms. Alomar's testimony, the ALJ stated that "[t]he claimants'[] subjective complaints and testimony of Ms. Diana Alomar are considered credible only to the extent that they are supported by the evidence of record as summarized in the text of this decision." (R. at 26.)  The ALJ appears to make additional comments regarding the credibility of Ms. Alomar's testimony under the domains of "acquiring and using information," "attending and completing tasks," "interacting and relating with others," and "moving about and manipulating objects." (R. at 21.) In each of these domains, the ALJ mentions Ms. Alomar's testimony, but weighs and rejects it based on other evidence in the record.  (*Id.*)  The ALJ is entitled to weigh and reject evidence before him, and the Court will not disturb the findings of the ALJ if they are supported by substantial evidence.  42 U.S.C. § 405(g); 42 U.S.C. § 1383(c)(3).

Nevertheless, the ALJ failed to weigh, reject, or even discuss Ms. Alomar's testimony under the domains of "caring for

yourself" and "health and physical well-being."  (R. at 24.)  Ms.
Alomar had testified regarding several aspects of Steven's
condition which may potentially give rise to a marked or extreme
limitation in these domains.  Ms. Alomar testified at great
length regarding Steven's medical conditions, including multiple
ear infections, visits to the emergency room for stopped
breathing, high fevers, severe sinus congestion, frequent falls,
not eating, continued difficulty eating with vomiting, poor
weight gain, failure to thrive, use of PediaSure instead of milk,
multiple medications, visits to multiple medical specialists, and
ongoing speech and occupational therapy.  (R. at 35.)  Ms. Alomar
also testified that Steven has a great deal of difficulty
interacting with other children, and has severe fears regarding
his environment (R. at 36.)

    Despite the relevance of the above testimony to the ALJ's
determination of Steven's disability, The ALJ made no mention of
Ms. Alomar's testimony under the domains of "health and physical
well-being" or "caring for yourself."  With regard to the "health
and physical well-being" domain especially, much of Ms. Alomar's
testimony may be quite probative to a determination of a marked
or extreme limitation.  ALJ Bullard concluded that "there is no
evidence to establish that the child has any problems with his
health and physical well being."  (R. at 25.)  He then stated in
his findings that "The claimant's subjective complaints and

testimony of Ms. Diana Alomar are considered credible only to the extent that they are supported by the evidence of record as summarized in the text of this decision." (R. at 26.)  Thus, the Court must assume that ALJ Bullard discredited Ms. Alomar's testimony regarding Steven's health and physical well-being because it was not "supported by evidence of record."  This is incorrect.  As the Court has already described, "The mere lack of corroboration of testimony does not provide a basis to reject [a] claim." *Sincavage v. Barnhart*, 171 F.App'x 924, 927 (3rd Cir. 2006); *see also* Soc. Sec. Rul. 96-7p (1996).  In the present case, not only has the ALJ wrongly rejected Ms. Alomar's testimony due to a supposed lack of corroboration, he has ignored other evidence in the record that *does* corroborate Ms. Alomar's testimony.  Particularly, ALJ Bullard failed to address various statements contained in Steven's IEP reports regarding his physical health, his delayed intellectual development, and his social problems which corroborate Ms. Alomar's testimony regarding Steven's disabilities.[2]

---

[2] For example, Ms. Alomar testified that Steven is speech delayed, suffers from frequent ear infections, falls a lot due to an inward rotation of his feet, suffers from feeding problems and other gastroesphogeal conditions, suffers from severe sinus congestion, and has socialization problems with other children. (R. at 34-39).  Steven's IEP reports corroborate Ms. Alomar's testimony regarding each of these conditions. (R. at 128, 146, 154-155.)

### C.

The Court may remand a case when "relevant, probative and available evidence was not explicitly weighed in arriving at a decision on the plaintiff's claim for disability benefits.'" *Dobrowolsky*, F.2d 403 at 407 (3d Cir. 1979).  Because ALJ Bullard did not explicitly address some evidence regarding Steven's developmental delays, it is unclear whether the ALJ discredited it, or simply ignored it.  *See Burnett v. Commissioner of SSA*, 220 F.3d 112, 121 (3d Cir. 2000); *Fargnoli v. Halter*, 247 F.3d 34, 42 (3d Cir. 2001).  In addition, the ALJ cannot discredit claimant's testimony simply because it is not supported by other evidence in the record, particularly when the record seems to contain a great deal of corroboration.

For these reasons, the ALJ should explicitly discuss and evaluate the relevant evidence set out above on remand.  *See* IV. A., *supra*.  The ALJ should also address Ms. Alomar's testimony under the domains of "caring for yourself" and "health and physical well-being."  *See* IV. B., *supra*.

### V.

For the aforementioned reasons, the Court will Vacate and Remand the final decision of the Commissioner denying Medina's application for disability benefits.  The Court will issue an appropriate order.

21

Date: November 30, 2006

s/Joseph E. Irenas
JOSEPH E. IRENAS, S.U.S.D.J.